Commonwealth *v.* Giovanetti, Appellant.

346

Argued January 13, 1941.   Before SCHAFFER, C. J.,
MAXEY, DREW, LINN, STERN, PATTERSON and PARKER,
JJ.

*Michael Marchesano,* for appellant.

*Ephraim Lipschutz,* Assistant District Attorney, with him *Charles F. Kelley,* District Attorney, for appellee.

OPINION BY MR. JUSTICE MAXEY, March 24, 1941:

This is an appeal from the judgment and sentence of death on a conviction of murder in the first degree. The appellant (now married to Rocco Giovanetti) was the wife of Pietro Pirolli, who died April 21, 1935, aged 53 years. The attending physician certified the cause of death to be chronic myocarditis.[1] Pirolli's body was exhumed in 1939 and the autopsy performed on it revealed that the cause of death was arsenical poisoning; the vital organs were found to contain "enormous amounts of arsenic."

The judgment and sentence now appealed from followed defendant's conviction by a jury. The corpus delicti having been established, the only question was the guilt of the accused. The Commonwealth's case is logically divided into two parts: (1) the evidence of motive, and (2), alleged incriminatory admissions made by her. The evidence of motive is weak and inconclusive. The defendant and her husband had been married twenty-three years and had lived together on friendly terms. All the insurance policies ever placed on the life of Pirolli, he himself had applied for. He had carried two

---

[1] The good faith of this physician is not challenged. It was disclosed that he had had no experience in poisoning cases.

insurance policies totalling $1010 as early as 1927 but these had lapsed. At the time of his death in 1935 there was a six-year-old policy on his life for $1,000 (and on which $150.00 had been borrowed), and a five-year-old policy for $440. As an employee of Merck and Company he participated in an employee's group insurance plan which provided for the payment of $1,500.00 on his death. His wife testified that she did not know of the existence of this insurance until after her husband's death and her testimony on this point is persuasive and uncontradicted. The policy for $440 had been "given" by the defendant with her husband's consent (so she testified) to Josephine Sadita in January, 1935, when defendant's husband was ill and the Sadita woman promised to cure him. She testified that her husband said in January: "Let her hold it [the policy] to see if she can cure me." Defendant testified that her husband "got very well at the time." This is not contradicted. During that January illness her husband had also the medical attention of two licensed practitioners. As the deceased was earning $20.00 a week just prior to his fatal illness in April, 1935, and as the expenses incident to his burial were $1,147.00, it is clear that the appellant had no reasonable expectations of profit from her husband's death.

The record does show that the poison which killed the deceased was probably administered to him by Josephine Sadita, now a fugitive from justice, and by Rose Carina, who is also indicted for this murder. Josephine appears in this record, in a rather shadowy form, as a worker of some form of "witchcraft." Defendant testified that her husband (Pirolli) "believed in those things." It was testified that the $440 policy "had no surrender value" until it had been in force six years (whether six years from its date or from January, 1935, does not appear). It had at the insured's death a value of $450.50. After the insured's death in April, the Sadita woman demanded the proceeds of

the policy. Defendant testified that she answered her demand by saying: "You ain't going to get a cent. I told you if you cured my husband, and he is dead." Mrs. Sadita replied: "Yes, but I gave him the care. Anyhow you have had to pay the doctor and you have to pay me." Defendant testified that Mrs. Sadita "trailed" her "three or four days" and threatened her and sent "a couple of men" to her home "until finally I had to give it to her." Defendant offered Mrs. Sadita $40 and the latter said: "I want the whole policy or nothing or you know what you are going to get." Defendant said: "You might put spells on me." Mrs. Sadita answered: "I can do worse than that." Then Mrs. Sadita's "common law husband" told the defendant that she "had to pay" Mrs. Sadita. Defendant testified: "Finally I took the money and gave it to her. Otherwise I could not come to work any more." (Defendant was employed at Bayuk Brothers at and before the time of her husband's death.) Defendant then gave Mrs. Sadita $440. The latter profited to that extent from the death of Pirolli and obviously planned after she received possession of the $440 policy in January to profit by his death. It was she who gave Pirolli "a cup of coffee" on Monday, April 15, 1935, while his wife was at work. After drinking this "coffee" he became violently ill and died six days later. The defendant testified that she left her husband at home that morning and upon her return home she learned about the "cup of coffee." Vincenzo Pelio, a boarder at the Pirolli home, testified that when he returned from work on Monday evening, April 15, 1935, he noticed that Pirolli did not look well and he said to him: "What has happened to you?" He answered: "I don't know, Jim, Josephine was over here this morning and we had a cup of coffee together, and since then I got my stomach upset." The witness said: "Then the wife [Pirolli's] came from work. She started to set the table. She asked him, 'Pete, why don't you eat?' He says he don't feel like to eat." The husband

was sick all that night. On Tuesday both husband and wife went to work, at different places. That evening the husband told his wife that he had "been laying down the whole day because I was very, very sick." At midnight he complained of a stomach-ache. Defendant called "Jimmy," the boarder, and told him to get a doctor. "Jimmy" called Dr. Boccella unsuccessfully and then called Dr. Aversa, who came and treated him. Pirolli was "worse" on Thursday and Dr. Aversa "gave him an injection to put him to sleep." On Friday night Pirolli said to defendant: "Grace, I think my life is gone." The defendant said: "You break my heart. Don't never talk that way." Saturday Pirolli wanted the doctor again. The latter came and thought it was "a very bad heart case" and advised on Saturday morning that the patient be sent to a hospital. He said that "quite a few people" were present each time he called. On Saturday night he asked why the patient hadn't been sent to the hospital and "they said the patient himself was not willing to go." At 11 p. m. Saturday the doctor said: "This man is going to die, he ain't got much to live, only about three or four hours more." Defendant testified she then said in reply to the suggestion about the hospital: "When he has to go to the hospital and die, might as well let him die in my bed. Why should I send him to the hospital to die there. So I would not let him." Pirolli died at 3 : 20 a. m. Sunday.

Thus far the evidence does not criminally connect the defendant with this homicide. The Commonwealth relies on certain alleged admissions by the accused. Detective Franchetti testified that after the defendant's arrest in 1939, she told him that on or about the 12th of April, 1935, the defendant "was complaining to Josephine Sadita about her husband and Josephine said to her, 'I can fix your husband, but it will cost you money' " and the defendant answered: "I haven't got any money, but I have two insurance policies." Defendant also said: "I will give you [Josephine Sadita] the smaller

one of the two policies if you will take care of him."
The agreement was made then that Josephine was to
take care of her husband for the smaller policy which
amounted to four or five hundred dollars. On Monday,
the day after Palm Sunday; Pirolli did not go to work
and Josephine was home with him. The Commonwealth
attempts to import a sinister significance to the word
"complain" as used by the defendant, and the word "fix"
as used by Mrs. Sadita, but these words as here used
are equally susceptible to interpretations favorable to
the defendant. The "complaint" may well have referred
to the husband's condition of health and while "fix"
may be used in a sinister sense, its true meaning is "to
put to rights."

Captain Kelly, the commanding officer of the Homi-
cide Division, testified that the defendant told him that
she and Josephine Sadita were "in conversation" in
January, 1935. Mrs. Sadita saw Dr. Boccella in defend-
ant's home treating her husband and said to defendant:
"Why use Dr. Boccella? I can do away with your hus-
band for a certain financial sum." Defendant answered
and said that she did not want to kill her husband at
that time, that she wanted him to be better and the con-
versation ended at that point.

Captain Kelly then produced a statement made by
the defendant on May 23, 1939, in the presence of cer-
tain officers and taken down by the official police stenog-
rapher. The statement contains the defendant's narra-
tion (already set forth in this opinion) relative to her
husband's last illness and these additional facts: Rose
Carina "was upstairs on Thursday" (April 18, 1935).
Pirolli called for his wife. She went to him. He said:
"It is time for me to get my medicine." Mrs. Carina
said: "Never mind Grace, I give it to him." Mrs.
Carina then gave him the medicine. Mrs. Carina stayed
with Pirolli in his room much of the time and when
no one else was present. When the question of sending
Pirolli to the hospital arose, a few hours before Pirolli's

death, Rose Carina said: "Don't send him to the hospital," saying: "What's the use, if he is going to die?" When Pirolli died, Rose Carina said: "I will call the undertaker." She did so. According to defendant's statements, she had known Rose Carina a couple of weeks before her husband's death and had known Josephine Sadita eight or nine years. Josephine lived in the defendant's house "from April or May until November 1936." According to the *statement*, Josephine came to the defendant's house "about three days before Pete got sick" and said: "I will get him to be better." Defendant replied: "I don't want nothing to happen to him. Get him better." "Josephine said she was going to get him better." In the statement the defendant then narrates the threats Josephine made after Pirolli's death, in order to induce the defendant to pay her the proceeds of the $440 insurance policy. She declared that Josephine said: "You are going to be sorry as a dog," and that Josephine and her boy-friend "Joe" said to her: "You will be dead in the street." Again Josephine came to her and said: "What about the policy?" Defendant said: "You don't get my husband better." Finally the defendant gave her the proceeds of the policy. She said: "Both checks amounted to $1,345.00."

Detective Lynch testified that he talked to the defendant while she was in custody on July 20, 1939, and she said to him that Rose Carina and Josephine Sadita "put me in trouble." He said: "How did they put you in trouble?" She said, "Well, they got me in this trouble for that policy." He said: "You knew they were killing your husband?" She said, "Yes, but they made me, because they knew I had this small policy." On cross-examination the detective said that at the time defendant made this statement, she was in his custody and was crying and was walking on the second floor of City Hall on her way "to the southeast corner for the elevator to go to the cell room." There was a large crowd in the corridor at the time, which was 12 M. The

witness was asked on cross-examination: "Did you ask her if she meant at the time that the husband died or thereafter?" He replied: "I didn't ask her anything." The question thus asked of the witness on cross-examination was not well framed to elicit whether defendant's "knowledge" antedated or postdated her husband's death. The detective made only a "mental note" of this conversation and he testified about it 68 days afterwards. He said he reported this conversation to his superior officer, but "could not say" whether that was a week or a month later.

The appellant denied that she ever told Detective Lynch or anyone else that she knew that they "were killing" her husband. She was asked by her own counsel: "When did you first know they were killing your husband?" She answered: "The night that I was arrested" (i. e., May 22, 1939). She denied administering any poison to her husband and denied knowing until after she was arrested that anybody had poisoned her husband.

The weighing and interpretation of Detective Lynch's testimony was one of the most important duties of this jury. If the defendant had knowledge beforehand that her husband was being killed and *if she aided the killers in* any way, *even to the extent of harboring them in her home for this felonious purpose,* she would be as guilty as they. On the other hand, if the defendant knew or suspected just before her husband died and after all the arsenic had been administered to him that they "were killing him" and did nothing to aid, encourage or countenance them, she would not be guilty. "The mere presence at a homicide and knowledge of its commission, does not make a person guilty unless he aids, assists and abets": Warren on Homicide, Vol. 1, p. 228, sec. 62 (citing cases). If one is "only a terrified onlooker," neither his presence at the homicide nor his failure to report it would make him an accomplice: *Bird v. U. S.,* 187 U. S. 118, cited with approval in *Com.*

*v. Loomis,* 267 Pa. 438, 444, 110 A. 257. If by her understanding of the detective's question and her reply to it, she meant nothing more than that she "knew" after her husband's death that "they" had killed him, this evidence alone would make the defendant neither an accomplice nor even an accessory after the fact, for a person who does nothing more than fail to report a murder is neither an accomplice nor an accessory after the fact: *Com. v. Mazarella,* 279 Pa. 465, 124 A. 163. Detective Lynch's testimony should have been submitted to the jury *under most careful instructions.* On the credit to be given to it and on its interpretation if credited, the fate of this defendant largely depended. If the question was asked as the witness said it was, did the defendant clearly comprehend it? Did the question import to her understanding a knowledge of the killing *before* the fact or *after* the fact? When she was on the stand her own counsel asked (as above noted) a question in the same form (i. e., "knew they were killing") as Detective Lynch's question, and her answer shows that she understood the question as relating to her "knowledge" of the fact of killing *after* the fact. The trial judge referred briefly to Detective Lynch's testimony and his reference to it shows that his own recollection of it was not verbally accurate. When witnesses testify to conversations, it is important to know whether they are narrating the exact language used or are merely giving *their later impressions* of the conversation. The question the detective said he addressed to the defendant was not phrased interrogatively. He said: "You knew they were killing your husband?" The question if *fairly* put should have been: "Did you know *before your husband died* that they were killing him?" If she replied "Yes," he should have asked, *When* did you first know this? This defendant obviously inept in the use of the English language may have missed the significance of the past perfect tense, in its *progressive* form; she may have understood the detective with charg-

ing her with knowledge of the killing *at the time* she paid, under alleged duress, Mrs. Sadita the proceeds of the $440 policy. The other phrase attributed to her: "They made me" is also indefinite. What did "they make" her do? Did "they make" her acquiesce in a plot to kill her husband, or did "they" merely "make" her turn over $440? All this was, of course, for the jury, but as to it the jury should have been given instructions which would have aided them in their quest for the truth.[2] We said in *Sears v. Birbeck,* 321 Pa. 375, 383, 184 A. 6: "It is a primary duty of the trial judge . . . in charging a jury to clarify the issues so that the jury may comprehend the questions they are to decide."

Appellant filed 37 assignments of error. Only a few of them require discussion. The 14th assignment is based upon the court's refusing defendant's offer to prove by a witness "that Josephine Sadita was engaged

---

[2] The necessity for being certain that the question addressed to an accused is clearly comprehended by the latter and the language of the reply (even if accurately reported) clearly imports an admission of guilt is well illustrated by an incident occurring in the trial of the so-called Salem witchcraft cases 250 years ago. According to John Fiske, the historian, "Rebecca Nurse had just been acquitted of witchcraft. The judge then told the jury that 'they must have overlooked the fact,—that in an unguarded moment, the prisoner had really confessed her guilt.' It seems that one of the prisoners, Deliverance Hobbs, had gone clean daft with fright, confessed herself a witch, and joined the accusing girls as a sort of king's evidence. When she was brought in to testify against Rebecca Nurse, the old lady exclaimed: 'What! do you bring *her?* She is one of us!' Of course, she meant *one of us prisoners,* but the atrabilious chief justice was sure she meant *one of us witches,* and he insisted that the jury should go out again. They were not convinced, but presently returning to the court room asked the accused to explain what she meant. She made no reply, and the jury at length reluctantly accepted this silence as a confession of guilt. Afterwards she explained that being somewhat 'hard of hearing and full of grief,' she did not realize what was asked of her. She was sentenced none the less and taken to the gallows." (Witchcraft in Salem Village by John Fiske, pp. 39 and 40).

in the business of fortune telling and curing people." We think that this offer so far as it relates to "curing people" should have been received. The Commonwealth's contention is that the defendant and Mrs. Sadita were in a conspiracy to poison Pirolli. The fact that the defendant permitted Mrs. Sadita, an unlicensed practitioner, to attend Pirolli during his illnesses would weigh against the defendant unless it could be shown that Mrs. Sadita was in the business of attending sick people. The defendant offered to prove this; she should have been permitted to do so.

The 18th assignment is based upon the statement of the trial judge in his charge that Detective Franchetti testified that defendant said to him on April 12, 1935, that "she complained to Josephine Sadita about the way her husband treated her." This was a mis-statement. What Franchetti testified to was that "she was complaining to Josephine Sadita about her husband." The complaint might well have referred to the husband's illness. There is no evidence that the defendant complained about her husband's treatment of her or had any occasion to do so.

The 15th assignment is based on the court's permitting over defendant's objection the Commonwealth to cross-examine the defendant about a conversation she had with Mrs. Sadita and Rose Carina about the death of Peter Stea. As this was long after the death of her husband and had no relation to it, the objection should have been sustained.

The 30th assignment is based on the court's refusing defendant's third point for charge reading as follows: "If the jury finds that Mrs. Giovanetti never knew until after the death of her husband that there was a $1500 insurance policy issued by the Prudential Insurance Company at the request of the employer, Merck & Co., then you must not take into consideration this insurance policy and you cannot consider this insurance policy as being a possible motive which would involve Mrs.

Giovanetti and therefore you would have to find that Mrs. Giovanetti spent more money on the funeral of her husband, namely, $1140, than she received from the $1000 policy with the loan on it." The court refused this point, saying that it was argumentative and it was for the jury to determine whether or not under all the evidence this defendant did know that her husband had a policy of life insurance in the company for whom he worked. In view of the fact defendant denied knowledge of the existence of this policy before her husband's death and there was no evidence to the contrary, this request so far as it related to this insurance policy should have been affirmed.

The 32nd assignment is based on the court's refusal of defendant's fourth point for charge reading as follows: "There is no evidence of any family discord or quarrels between Mrs. Giovanetti and the deceased, and the uncontradicted evidence in this case which is a fact to be taken into consideration by you in weighing the Commonwealth's case, is that the defendant showed nothing but friendliness, love and affection for Pietro Pirolli." This point while somewhat over-stated might well have been affirmed because the evidence was that the relations between defendant and her husband were amicable.

The 33rd assignment is based on the court's refusal to affirm defendant's eighth point for charge, which was as follows: "You must find as a fact that Grace Giovanetti formerly Grace Pirolli, never applied for a single policy of life insurance on the life of her husband or had anything to do with effecting this insurance." This point while not properly framed could with slight change of phraseology well have been affirmed. The insurance agent testified that the $1,000 policy and the $440 policy were taken out by Peter Pirolli himself.

The 37th assignment is based on the excerpt of the charge relating to character testimony, reading as follows: "The defense introduced a number of other wit-

nesses who testified as to the defendant's good reputation. . . . They testified as to her reputation for honesty, good character and humaneness. This character evidence, or it may better be called reputation evidence, goes to the substance of the case, and must be considered with all the other evidence. Being substantive evidence, it must be considered by you, and if it raises a reasonable doubt in your mind, as to guilt of the defendant, she should have the benefit of that doubt."

We said in *Com. v. Cleary,* 135 Pa. 64, 84, 19 A. 1017: "Evidence of good character is always admissible for the defendant in a criminal case; it is to be weighed and considered in connection with all the other evidence in the case,—it may of itself, in some instances, create the reasonable doubt which would entitle the accused to an acquittal. The rule itself is not merely merciful. It is both reasonable and just. There may be cases in which, owing to the peculiar circumstances in which a man is placed, evidence of good character may be all he can offer in answer to a charge of crime. Of what avail is a good character, which a man may have been a lifetime in acquiring, if it is to benefit him nothing in his hour of peril." In *Com. v. Howe,* 42 Pa. Superior Ct. 136, the lower court, in the trial of a defendant, charged the jury with reference to character testimony as follows: "It is for you to say whether he [defendant] has proven such previous good reputation by the testimony of these witnesses. If he has, if you are satisfied that he had that kind of a reputation before the time of his relations with this girl, then that is a fact that he is entitled to have considered by you, and it is for you to say whether that in itself operates to create a reasonable doubt, if you find that he had such reputation." In a subsequent part of the charge the evidence of good character is referred to as "a fact to be taken into consideration and weighed in the scales in his favor, and as viewed by you to see whether in itself it operates to create a reasonable doubt." The Superior Court re-

versed the court below, saying: "It is not the only office of evidence of good character to create a reasonable doubt. It has frequently been said that it is substantive evidence to be weighed and considered in connection with all the other evidence in the case. 'The evidence of good character is to be considered with the other evidence in the case and if it all combined creates a reasonable doubt the defendant is to be acquitted': *Com. v. Cleary,* 135 Pa. 64. Such evidence is offered not simply to raise a reasonable doubt but to establish the innocence of the defendant and is to be regarded as a fact like any other tending to establish the defendant's innocence and ought to be so regarded by both court and jury: *Hanney v. Com.,* 116 Pa. 322. Such evidence does not raise a distinct issue; nor is it brought into the case as a mere make-weight. It is to be taken into account with all the other evidence in the case, and if the whole of that evidence is sufficient in the judgment of the jury to show that the defendant is not guilty or to create a reasonable doubt on that point the defendant is entitled to an acquittal: *Com. v. Cate,* 220 Pa. 138 [69 A. 322]."

The excerpt cited in the instant case fell short of the requirements as thus laid down by both the Supreme and Superior Courts of this Commonwealth.

All the assignments of error referred to are sustained.

The charge should have made clear to the jury the nature of circumstantial evidence, and in language understandable to lay minds the jury should have been instructed that if the evidence could reasonably be explained on any other theory than that of the guilt of the accused, she should be acquitted.

This court in *Com. v. Bardolph,* 326 Pa. 513, 521, 192 A. 916, quoted with approval the following from *Com. v. Benz,* 318 Pa. 465, 472, 178 A. 390: "When a charge of crime is sought to be sustained by circumstantial evidence, the hypothesis of guilt should flow from the facts and circumstances proved, and be consistent with them all. The evidence must be such as to exclude to

a moral certainty every hypothesis but that of guilt of the offense imputed; the facts and circumstances must not only be consistent with and point to the guilt of the accused, but they must be inconsistent with his innocence." In *Com. v. Bone,* 64 Pa. Superior Ct. 44, that court said that evidence sufficient to implicate an accused in a crime "must be something more than evidence showing remote connection between the accused and the crime, or evidence that merely raises a suspicion of guilty intention: 5 Corpus Juris 579." An accused is entitled to an acquittal if his guilt of the crime charged is *not* the only reasonable interpretation of which the facts adduced against him are susceptible. Guilt must be *proved* and not merely *conjectured.*

While the language of the trial judge as to the quality of the circumstantial proof required for a conviction is technically correct, it was so abstruse as to be of doubtful helpfulness to the jurors in their deliberations. For example, the court said: "The evidence [circumstantial evidence] must be such as to exclude to a moral certainty every hypothesis but that of guilt of the offense imputed. A hypothesis is a statement of fact or of theory which, without itself having been proved, is taken for granted as a premise from which to test or discover an assured conclusion, a logical supposition; more widely, a supposition of an imaginary state of things assumed as a basis of reasoning." This language scarcely meets the test laid down by this court in *Com. v. Petrillo,* 338 Pa. 65, 93, as follows: "Trial judges when giving instructions on circumstantial evidence should do so in the language of laymen rather than in the language of legal experts, so that the jury may be helped in their deliberations."

There are circumstances in this record which cast suspicion on the accused and there are also circumstances which tend to exculpate her. As already pointed out, no motive for this murder *and operative on this defendant* has been shown. Her conduct when she re-

turned from work on Monday, April 15, 1935, and found her husband ill, was conduct consistent with her innocence. Nothing in her conduct during her husband's illness indicated consciousness of guilt. She immediately directed the boarder to "call a doctor." She specified no doctor and the boarder secured the services of the first doctor he found available, Dr. Aversa. The latter was afforded full opportunity to diagnose the patient's symptoms. That he failed to diagnose this case of arsenical poisoning was due to nothing said or done by this defendant. While the defendant did not accept Dr. Aversa's advice given seventeen hours before Pirolli's death to send him to a hospital, a verdict of guilty of murder cannot be predicated on that fact. The defendant may well have believed that sending her husband to the hospital at that late stage in his illness would accomplish nothing. Her husband on Friday night had told her he thought his life was "gone." The doctor himself offered no hope of his patient's recovery when he advised sending him to the hospital.

The court below in its opinion refusing a new trial in this case quoted Vincenzo Pelio (the boarder) as testifying that "on the day Pirolli became sick, he wanted nothing to eat but the defendant forced him to eat." This "forcing" Pirolli "to eat" might seem sinister if the balance of Vincenzo's testimony is ignored. Vincenzo, as already pointed out, testified that Pirolli was sick when his wife reached home Monday night and Pirolli told about the cup of coffee he and Josephine had had "together this morning" and since then his "stomach was upset." The witness did say that the defendant after inquiring why Pirolli did not eat, "forced him to eat" and Pirolli "got a couple of spoons of supper and he quit." The court then asked: *"Who made the supper that night?"* and the witness replied: "The husband made the supper and I helped him. I learned to cook." The defendant's "forcing" her husband to eat a little of the supper he and his boarder

prepared when she was at work cannot justly be given any criminal significance. It is not unusual for a wife to urge, i. e., "force," a sick member of her family to eat.

The most incriminating evidence against this defendant, if the Commonwealth's interpretation of it is accepted, is that of Detective Lynch. Before this evidence can be so used, the jury must be satisfied of the witness's veracity and of the facts that the defendant understood the exact meaning of the question put to her, that the detective understood her answer, and that ten weeks later he accurately reported both question and answer. The benefit of any doubt about all this belongs to the defendant.

The defendant's answer to the detective's question, if *both* question and answer were clearly understood and correctly reported, *can* be interpreted as a confession of guilt. Whether confessions are valuable or valueless depends on circumstances which must be carefully considered by those who base their judgments upon them. All alleged confessions when submitted to jurors, should be accompanied by clear and helpful instructions.

As to the value of "confessions," Wigmore on Evidence, 3rd ed., Vol. 3, sec. 866 says: "Assuming the making of a confession to be a completely proved fact —its authenticity beyond question and conceded,—then it is certainly true that we have before us the highest sort of evidence. . . . But how do we get to believe in the fact of a confession having been made? Always and necessarily by somebody's testimony. And what is our experience of that sort of testimony on which we are asked to believe that a confession was made? A varying and sometimes discouraging experience. Paid informers, treacherous associates, angry victims, and over-zealous officers of the law,—these are the persons through whom an alleged confession is oftenest presented; and it is at this stage that our suspicions are aroused and our caution stimulated. Suppose a judge

is offered from the lips of a single witness a detailed and complete avowal of guilt, attributed to the accused, and suppose the accused denies absolutely the fact of confession; suppose the judge now to think of himself, 'Here is a confession which, if authentic, would make this man's guilt clear beyond doubt. But do you expect us to take it as authentic, against his denial, on the word of this man alone, who has such and such strong motives for inventing it or for misinterpreting what was said? Must we not listen to him with the greatest doubt and suspicion? Then, would it not be natural for the judge, in commenting on such evidence to the jury, to say: 'What you have heard here from this man about a supposed confession is to be taken with caution; for that is the weakest and most suspicious kind of evidence.' This is a natural and proper attitude, and it is precisely that of the authorities above quoted. They were thinking, not of the *confession as evidence* of the act, but of the *testimony to the alleged confession*. Take, for instance, the phrase above of Mr. Justice FOSTER's [Sir Michael Foster] which has been quoted again and again [with and without acknowledgment] in the records of the profession for a century and a half, in the mangled and misleading form that 'confessions are the weakest and most suspicious of all evidence.' Why did he so regard them? Not because of their own evidential weakness; but for the following reasons: 'Proof may be too easily procured; *words are often mis-reported*—whether through ignorance, inattention, or malice, it mattereth not to the defendant, he is equally affected in either case; *and they are extremely liable to misconstruction.*' . . . In other words, the suspicion that he has found it necessary to entertain is directed entirely to the work of *proving an alleged confession* [italics supplied]. . . . We are inclined to hesitate and demand the most satisfactory testimony before we accept that as a fact which, if believed, will practically render other evidence superfluous."

Considerations such as these just quoted should have been placed before the minds of the jurors before they retired to deliberate on whether or not they would accept as authentic against the defendant's denial, an alleged confession, on the word of one man alone who may possibly have misinterpreted or have partially forgotten what was said.

The judgment is reversed and a new trial is ordered.

Mr. Chief Justice Schaffer, Mr. Justice Drew and Mr. Justice Linn concur in the judgment.