Commonwealth *v.* Holt, Appellant.

Argued May 22, 1944. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and HUGHES, JJ.

; reargument refused October 31, 1944.

*J. I. Hook* of *Scott & Hook,* for appellant.

*Frank Throckmorton,* District Attorney, with him *J. E. Isherwood,* Special Assistant District Attorney, for appellee.

OPINION BY MR. JUSTICE LINN, September 26, 1944:
The appellant, Nancy Jeanette Holt, was indicted and tried for the murder of her husband by arsenical poisoning. The jury rendered a verdict of guilty of murder of the first degree and fixed the penalty at imprisonment for life; she was sentenced accordingly: Act of May 14, 1925, P. L. 759, 18 PS §2222. In compliance

with the Act of February 15, 1872, P. L. 15, 19 PS §1186, we have reviewed both the law and the evidence and are of opinion that the ingredients necessary to constitute murder of the first degree were proved to exist.

The assignments of error, complaining that the evidence was not sufficient to establish the corpus delicti, are overruled; there is ample evidence to support a finding of felonious homicide. While no witness testified to having seen appellant administer the poison, circumstances were shown from which the jury, as its verdict indicates, could determine beyond a reasonable doubt that appellant furnished and administered it.

She testified that she was 29 years old; that her home was in Oklahoma. Her husband's age is given as 33. Each had been married before. She married Holt February 4, 1941, in Madill, Oklahoma. He was a tractor driver in the construction of pipe lines and came to Waynesburg, Greene County, Pennsylvania, in January, 1943, to work at that occupation. He died between noon and one o'clock on May 27, 1943, in a furnished three-room apartment rented from Mrs. Sellers, into which he moved March 2nd. The apartment was on the second floor. Mrs. Sellers also occupied a room or rooms on the same floor. The first floor of the house was occupied by B. Wayne Michael, his wife and daughter. There is evidence that during the time Holt lived in the Sellers house, he occasionally had convulsions, nausea and vomiting spells. Nausea and vomiting are said to result from taking arsenic.[1] Mr. Michael testified that for some time before Holt's death he heard him get up at night and vomit. Dr. Walker testified that in his conversation with Mrs. Holt on Thursday, the 27th, shortly after Holt's death, she informed him that he suffered with nausea and vomited that morning. Holt consulted a physician, Dr. Hart, who saw him twice, once in March

---

[1] Appellant's brief quotes from Herzog's Medical Jurisprudence, Section 1345, p. 918, "The first symptom is generally a burning sensation in the throat, followed by nausea and vomiting . . ."

and once in April, for what the doctor thought was "an acute gastric intestinal upset"; to aid him in diagnosis, he desired an x-ray of Holt's gall bladder and referred him to Dr. A. Carl Walker of Waynesburg to have the x-ray taken. Holt saw Dr. Walker and stated that he had been suffering from intense nausea and vomiting for a week prior thereto. Dr. Walker, in preparation for the x-ray, prescribed for him a gall bladder dye and paregoric with directions for taking them on the evening before the date fixed for the x-ray, instructing him to appear the next day without having eaten breakfast. The day fixed was the Friday before Holt's death but he did not keep the engagement; Mrs. Holt advised the Doctor that Holt could not retain the gall bladder dye on account of nausea and vomiting.

Holt went to work on the morning of Thursday, May 27th, but came home about eleven o'clock, said he had a chill, and lay down on his bed; Mrs. Holt was in the room with him. About 12 o'clock he had a convulsion and became very ill, said he was in great pain. While Holt was in the convulsion, which immediately preceded his death, Mrs. Holt called to the Michaels, occupying the downstairs apartment, "to come upstairs," and Mrs. Michael testified, ". . . of course we [herself, husband and daughter] all ran to see what was wrong." Holt was then, as Mrs. Michael said, "unconscious, and black, he was very black when he was in this convulsion." Mrs. Sellers, from her room on the second floor, opposite Holt's room, also came in. When Holt became conscious, he "told us that capsule he had taken had made him sick; . . . that capsule made me so sick." He said, "You know, I was feeling pretty good there a half hour ago." He begged [2] them to do something for him. Mrs. Holt

[2] Mrs. Michael testified: "A. Well, he just begged us to do something for him, he was in pain, he was in misery, he couldn't breathe and he complained of just being able to breathe so deep, and of course during this time while he was conscious his arms give these awful hard jerks, and he said, 'My God, Mrs. Michaels, what's wrong with me', and of course I didn't know."

left the house to get some whisky. When she returned, Holt was dead; Mrs. Sellers met her on the porch and informed her of the fact. Other witnesses testified in corroboration.

Holt's physician, Dr. Hart, could not be reached by telephone and Dr. A. Carl Walker was called. He testified that, when he arrived, Holt was dead, that his face and neck were swollen and that his body was discolored as far as the nipple line. He examined his abdomen and found that it was soft from which he inferred that there was no peritonitis such as would have resulted if the gall bladder had ruptured.[3] He concluded from his examination that Holt suffered what he called a "heart block" and signed a death certificate that Holt died of coronary occlusion. He said the discoloration of the body and the swollen appearance of the face and neck made him suspect death by "some chemical poisoning." [4] Holt had an industrial policy of insurance in the sum of

---

[3] Dr. York, who participated in the autopsy, was asked, "Q. Doctor, when you performed, or helped perform the autopsy on the body of Jess Holt, did you examine the gall bladder and the region surrounding it? A. Yes, sir. Q. Could you from such an examination tell if the gall bladder had ruptured and caused death? A. Yes, sir. Q. Did it? A. No. Q. No? A. No."

[4] He testified: "I did notice his neck was swollen, and face. The outstanding thing was the discoloration of his face and neck and chest. To me that meant that this man had possibly died of some chemical poisoning which had paralyzed the nerve supply and the muscles of his heart and respiratory center. As a result, the blood had been trapped in his head. This condition we call heart block, whether it be of the nerves itself or the muscles. The block can take place anywhere in the sympathetic nerve which supplies the heart, or the vagus nerve or upper half of the heart, or the auricle or ventricle or anywhere in between. The chemicals which cause this type of death are arsenic, phosphorous and strychnine. I considered the fact that this man may have had a gall bladder which had ruptured with peritonitis, but on the other hand, a man with peritonitis is not able to go to work, he is doubled up with pains and cramps and hunting the relief of a hypodermic of morphine. The man had no history of shortness of breath or pain in the chest or arms or neck to indicate he may have had before this disease of his coronary vessels."

$518, taken out a short time before, and Dr. Walker was asked to sign a proof of death. One of the questions on the form was: "Was death due to suicide, homicide or accident? Please specify", and he answered that question "No." At the foot of the certificate for the insurance company he wrote, "I am not sure what caused this man's death. The local coroner investigated the case and ask[ed] me to sign the death certificate. I feel that an autopsy should of [have] been performed." Dr. Walker testified that he called the coroner and instructed him to investigate the case, saying, "I told him that I was not sure what caused this man's death, there were certain circumstances surrounding the death that made me suspicious." The only time he had seen Holt before, was when the engagement was made for the gall bladder x-ray.

An undertaker took charge of the body, embalmed it, and on Friday evening, the day after the death, it was sent to Madill, Oklahoma, for interment. Mrs. Holt and Jean Lough of Waynesburg went to Madill by the same train. The District Attorney and the State Police had been notified of Holt's death and, as a result of their investigation, notified the authorities in Marshall County, Oklahoma, to have an autopsy performed. The results of the autopsy, showing arsenic trioxide in the viscera, were given in evidence and became the bases of opinions of physicians that Holt died of arsenical poisoning.

In the room in which Holt died some brown pills and white capsules in a box were seen; and receptacles containing a white powder; other things, said to excite suspicion, were also found. The box containing the brown pills and the white capsules, which had been seen by the Michaels on the day of Holt's death, disappeared and could not be found after Holt's body was shipped to Oklahoma. Those remaining were delivered to the State Police who delivered them to the Pittsburgh Testing Laboratories for analysis. The analysis showed that some of them contained arsenic. Mrs. Holt admitted

that she bought quantities of arsenic, explaining that she purchased it for use as a douche. Arsenic was kept at several places.[5]

Mr. Ganier, a witness employed in a drug store, testified that on May 16th Mrs. Holt asked him for arsenic and that he told her they had none. Mr. Leckey testified that she came into his store on May 24th and asked for rat poison. He ". . . handed her a tube of Elkay rat paste, which I explained was a phosphorous paste and very dangerous because there was no satisfactory antidote." She asked if it "would kill a person." He said, "My God, woman, that would kill anything." She purchased it. Mr. Leckey was corroborated by witnesses who were present in his store at the time. Mr. Krause, of Washington, Pa., testified that on May 26th, about 11.30, she came into his store and asked for rat poison. He showed her several kinds. She said, ". . . she had a lot of trouble with them and they didn't do the work. She said she was bothered a lot by rats [6] and she asked me if I could sell her arsenic, and I told her no, that I didn't have any, and then she asked me for strychnine, and I sold her a small quantity of strychnine . . . one dram, sixty grains . . . white powder . . . in a little bottle." She gave as her address 177 High Street, which was not the address at which she was living; she was living at 340 East Lincoln Street. He recorded the sale in a poison registry maintained by him. Mrs. Holt admitted that she bought this strychnine but denied that

---

[5] Mrs. Holt testified: "Q. And who put the arsenic in the bottom of the percolator and around the corner of the shelf out of sight there? A. In the bottom of the percolator? Q. Well, the teapot if it wasn't a percolator, with a bottom of that sort? A. I did. Q. You shoved it around the corner of the cupboard? A. That's where I kept it. Q. That's where you kept it? A. Yes, sir. Q. Who put the box of arsenic in the drawer that was full of junk in back in the fore corner in the bottom and with a table shoved up against the drawer? A. The box of arsenic, did you say? Q. Yes. A. Why I suppose I put the box in there."

[6] Witnesses who lived in the house said there were no rats about.

she asked for arsenic. Mr. Headlee, another druggist, testified that on February 15, 1943, he sold an ounce of arsenic trioxide to appellant, and another ounce on May 13th. He asked her what it was to be used for and she said "rat poison" and he so recorded it in his poison registry. She again gave her address at 177 E. High Street, although she did not live there.

Miss Lough, a high school junior who had studied chemistry, saw Mrs. Holt "about every day" and was asked by her about the use of a poison which Mrs. Holt described; the witness informed her "it was probably arsenic or strychnine." Miss Erskine corroborated this.

Three physicians testified that Holt died from arsenical poisoning. Two of them had not seen him but based their conclusions on hypothetical statements. Dr. Ramsey, a pathologist of experience, described in appellant's brief as "an expert toxicologist," testified: "Q. Doctor, if the report of the chemist showed you that the stomach content, content [contained] 1.05 grains per pound, the stomach tissue 0.2 grains per pound, the liver tissue 0.09 grains per pound, and the kidney 0.07 grains per pound, and the spleen tissue 0.05 grains per pound of arsenic trioxide, what in your opinion, Doctor, was the cause of the man's death? A. Well, my opinion would be his death was due to arsenic poisoning." There was evidence that a fatal quantity is from 1½ to 3 grains of arsenic trioxide. It will be noted that the question propounded involved 1.46 grains. There is evidence that arsenic is eliminated in various ways and that Holt had vomited as recently as the morning of his death.

On behalf of the appellant, it is contended that "The Commonwealth utterly failed to produce any other evidence to establish the cause of death. Having based its case exclusively upon the results of the analysis which showed less than a lethal dose of arsenic was recovered, which experts stated would not cause death under ordinary conditions, the Commonwealth should have been required to show that death was not from a natural cause."

It is settled in this Commonwealth that it is not necessary to show that arsenic, in quantities sufficient to kill, was found in the body after death: *Commonwealth v. Danz*, 211 Pa. 507, 515, 60 A. 1070. The Commonwealth must show beyond reasonable doubt that death resulted from poison feloniously administered. Enough was shown to go to the jury to determine that Holt's death resulted from arsenical poison and not from natural causes. We must also reject the argument that there is no proof of felonious intent. It is within the province of the jury to find such intent from the circumstances shown. The appellant admitted the purchases of the poisons. There is evidence from which the jury could find that in order to divert suspicion she falsely stated the purposes for which she purchased them; such statements were part of the circumstances that would support a finding against innocence: compare *Commonwealth v. Lettrich*, 346 Pa. 497, and cases cited p. 499, 31 A. 2d 155.

Appellant suspected her husband of going about with other women and attempted to follow him. Mrs. Hill, who testified she saw appellant "about every day," said that on May 12th, she and appellant drove about Waynesburg and vicinity looking for their husbands; went after them to Washington, Pa., and, not seeing them there, went to Pittsburgh; drove about Pittsburgh and finally returned to Waynesburg after dark and found that their husbands had returned. According to Mrs. Hill, she and appellant stopped rather frequently and drank whisky. On that evening, as a result of a quarrel on this subject, Holt beat his wife.

Mrs. Sellers testified that about eleven o'clock at night, she heard what apparently was an altercation in the Holt bedroom and that the next morning Mrs. Holt appeared with a black eye, a bruised mouth and a discolored cheek. At another time Mrs. Sellers was awakened early in the morning by Mrs. Holt tapping on her door; Mrs. Holt stated that her husband had locked her out; she asked Mrs. Sellers to permit her to go through

her room to a porch from which she could enter her own bedroom through a window.

Mrs. Michael testified to a conversation with the appellant, ". . . just two or three nights before Mr. Holt died" in which appellant told her ". . . that she didn't intend to live her life with Jess Holt, and I said, 'Jeanette, what are you going to do?' She said, 'I don't know, but I do not intend to live with him. . . .' ".

Ariel Erskine testified that on the day after Holt beat appellant, she said "that Jess had killed her love, she didn't care what happened to him, and he could die, or be poisoned or killed or anything, that she wouldn't care, that she knew his weak spot." She also said "she would get at him somehow." Jean Lough gave similar evidence. The evidence referred to was relevant on motive: compare *Commonwealth v. Westwood*, 324 Pa. 289, 300, 188 A. 304.

A question arose when Mr. Rogers, the chemist, was on the stand. Having been asked what effect the embalming fluid would have on the poison in the viscera, he stated that there would be no chemical reaction that would change the arsenic. He was then asked to state "the active ingredients of standard embalming fluid." Counsel for appellant objected "unless . . . [he] knows what embalming fluid was used . . ." The court sustained the objection. The undertaker had testified that he used a standard product, that ". . . there is a state law regarding the manufacturing of embalming chemicals. It cannot contain arsenic or any poison of that nature." The witness, Rogers, was then reminded that the undertaker had stated that he used "a standard embalming fluid" and was asked whether there was arsenic in it. He replied that "I have never found one that had arsenic in it" though he had ". . . analyzed possibly twenty different brands." He was then asked whether he had examined the embalming fluid which the undertaker said he used, and replied that he had not. This evidence is complained of; we think defendant was not prejudiced.

When Dr. Ramsey, the pathologist, was on the stand, he testified: "Q. Well, Doctor, does the single contents in the organs examined by the chemist contain more than three grains of arsenic? A. No. Q. That is, the contents found is less than what normally causes death from arsenical poisoning? A. Well, that is true. Q. That's all. The Court: That leaves out all he threw up and all he eliminated and that his body threw off, the actual amount there is less. By the Witness: A. That's right." The appellant contends that the court made a prejudicial statement. What, in fact, the court did was to suggest a question, though not in interrogative form, which the witness answered by saying, "That's right." The assignment is overruled.

Several assignments complain of the admission of testimony concerning phosphorous and strychnine. Phosphorus was said to be an ingredient of rat paste. There was found in the Holt apartment a jelly glass containing a mixture of jelly and peanut butter and with a strong odor of phosphorus. In the garbage can were various containers with traces of phosphorus. Appellant's purchase of strychnine was shown. Evidence of these circumstances could not well have been kept out of the case, and the learned trial judge instructed the jury to limit its inquiry to death by arsenic [7] and to disregard the other poisons. The assignments are overruled.

Parts of the charge are complained of in appellant's brief. In the course of his instructions to the jury, the learned judge said: "It is a general rule that all homi-

---

[7] We quote from the charge: "Many times during the course of the trial, almost of necessity under the circumstances, it developed that this defendant had purchased other kinds of poison, phosphorus and strychnine, and another,—I forget just all about it, it does not matter very much,—and the instruction of this Court is to you, that the charge of the Commonwealth is that this deceased met his death by the sole administering of arsenic, and not phosphorus, and not strychnine, and not any other kind of poison. There is no evidence of any other kind of poison being administered, there is no evidence of any other kind of poison in his body, there is no evidence of any

cide is presumed to be malicious, that is, presumed to be murder of some degree, until the contrary appears in evidence." That is not an accurate statement as appears in the criticism of a similar statement in *Com. v. Elliott*, 292 Pa. 16, page 21 et seq., 140 A. 537, and in *Com. v. Kluska*, 333 Pa. 65, page 71 et seq., 3 A. 2d 398. But in this case, as in *Com. v. Elliott*, it could have done no harm, because the real question here was not the nature of the homicide but who administered the poison. Our statute provided that "All murder which shall be perpetrated by means of poison . . . shall be murder in the first degree": Act of June 24, 1939, P. L. 872, sec. 701, 18 PS §4701.

The 13th and 14th assignments may also be considered together. The 13th complains of the statement that "The Commonwealth is not bound to produce evidence that will exclude every possibility of the defendant's innocence, it is only required to prove his guilt beyond a reasonable doubt."

The 14th complains of the answer to Point 7, "Point 7. Even if every material circumstance in the case upon which the Commonwealth relies to establish the guilt of the prisoner be proved beyond a reasonable doubt, these circumstances must establish to a moral certainty the particular hypothesis or inference set up by the Commonwealth, and that alone. If these circumstances, when so proven, are consistent with the hypothesis or inference relied upon by the defendants, or with any other hypothesis or inference not involving the guilt of the defendant, the jury must adopt the inference favorable to the defendant and render a verdict of 'Not Guilty.'

---

other kind of poison which possibly under all the circumstances proved, could have been the cause of his death, and for that reason the Court now instructs you to disregard any other poison as a possible instrumentality of death of Jesse H. Holt, leaving only for your consideration the question as to whether or not he was poisoned or came to his death as the result of having administered to him the poison known as arsenic."

"Answer. That is generally correct. There is a possibility that it is incorrect from the use of the word 'hypothesis' and the use of the words 'moral certainty'. The guilt of the defendant must be proved beyond a reasonable doubt and that doubt must not be conjured up, as we have explained here before, but we are a little afraid about the use of the words 'moral certainty.' All the burden there is upon the Commonwealth is to prove the guilt beyond a reasonable doubt. This point is affirmed with that qualification."

We must overrule the assignments. The Commonwealth is not required to satisfy the jury beyond all doubt, a conclusion that necessarily follows from the requirement that the jury must be satisfied beyond a reasonable doubt. The defendant was not prejudiced by the judge's hesitation to require the jury to consider the metaphysical concept of "moral certainty." [8] In *Com. v. Libonati*, 346 Pa. 504, 508, 31 A. 2d 95, a case in which a conviction on circumstantial evidence was sustained, Mr. Justice PATTERSON said: "Nor may we say, as a matter of law, that the guilt of the accused has not been sufficiently established to carry the case to the jury merely because of a remote possibility that the evidence, or some part of it, might be true and the accused still be innocent. The requirement of the law is that in order to warrant a conviction the facts and circumstances proved must be of such character as to produce a moral certainty of the guilt of the accused beyond any reasonable doubt—not that they need be absolutely incompatible with his innocence—and that doubt is for the jury unless the evidence 'be so weak and inconclusive that as a matter of law no probability of fact can be drawn from the combined circumstances': *Common-*

---

[8] In *State v. Koski*, 100 W. Va. 98, 130 S. E. 100, 101, for example, it was said that "beyond a reasonable doubt" and "to a moral certainty" are synonymous terms; that either might be used but that to give both to the jury might lead them to think "that something more than proof beyond a reasonable doubt was necessary before they could convict". See also *Hopt v. Utah*, 120 U. S. 430, 440, and Dean Trickett's analysis quoted in 9 Wigmore (3rd ed. 1940) at p. 322.

wealth v. DuBoise, supra, 269 Pa. page 174, 112 A. 461.
See also Commonwealth v. Karmendi, supra, 328 Pa.
page 334, 195 A. 62; Commonwealth v. Giovanetti, 341
Pa. 345, 359, 19 A. 2d 119; Commonwealth v. Marino,
142 Pa. Superior Ct. 327, 333, 16 A. 2d 314." See also
Com. v. DePetro, 154 Pa. Superior Ct. 535, 543, 36 A. 2d
513; Com. v. Meyers, 154 Pa. Superior Ct. 8, 11, 34 A.
2d 916.

The 15th assignment complains of the refusal of a
request for charge which was not read to the jury:
"Point 13. Unless each fact proven by the Common-
wealth is consistent with the fact that the prisoner com-
mitted the offence charged, and consistent with the other
facts established, and unless such facts are inconsistent
with the conclusion that the deceased died in some other
way, than at the hands of defendant, your verdict must
be 'Not guilty'. Answer 'Refused.' " Substantially that
instruction is contained in the charge; it was unneces-
sary to repeat it.

The 16th complains of a sentence from the charge
on the ground that it was "inadequate, involved, intri-
cate and misleading." The extract is as follows: "We
instruct you that while the Commonwealth must prove
its case by a preponderance of evidence, still the proof
need not be the direct evidence of persons who saw the
occurrence sought to be proved, but facts may also be
proved by circumstantial evidence, that is, by proof of
circumstances, if any, such as give rise to a reasonable
inference in the minds of the jury of the truth of the
facts alleged and sought to be proved, provided such
circumstances, together with all the evidence in the case,
constitute a preponderance of evidence."

The learned judge, in dealing with the circumstan-
tial evidence, stated the contentions of both the Common-
wealth and defendant. The extract is not complained
of as an erroneous statement of the rules governing
burden of proof and reasonable doubt. Fifteen times
throughout the charge and the affirmance of points, the
jury was instructed that the evidence must satisfy them

beyond a reasonable doubt. While standing alone, the quotation would be subject to criticism, we are satisfied that, when considered with the entire charge, appellant was not prejudiced and that the jury understood that it must be satisfied beyond a reasonable doubt: compare *Com. v. Quaranta*, 295 Pa. 264, 275, 145 A. 89.

After counsel made their speeches to the jury, we understand that "the defendant [objected] to the statement of the District Attorney 'Why all these lies of the defendant' as being prejudicial, being the opinion of the District Attorney." He asked that a juror be removed and the case continued. In his opinion, refusing a new trial, the learned judge said, with respect to this matter, that he ". . . stopped the acting District Attorney from the use of that objectionable word. The remark was used by the Acting District Attorney during his discussion of the testimony of various witnesses for the Commonwealth who were contradicted by the defendant, or vice versa. . . ." We are unable to see how the legal interests of the defendant were in any way interfered with by the remark, and especially is that true when the Court immediately stopped the use of the word and called the attention of the acting district attorney to the fact that the use of the word "lies" was not permissible. The contradictions upon which the acting district attorney commented were apparent. The learned judge's account of the incident shows there was no abuse of discretion such as appeared in *Com. v. Petrillo*, 338 Pa. 65, 94, 12 A. 2d 317. Here the judge immediately stopped and warned the district attorney who immediately desisted. Compare *Com. v. Massarelli*, 304 Pa. 335, 156 A. 101; *Com. v. Touri*, 295 Pa. 50, 144 A. 761. In *Com. v. Meyers*, 290 Pa. 573, 581, 139 A. 374, 377, we said: "Where, under all the circumstances of the case, the verdict rendered is a just one, the language of the prosecuting officer which will justify a reversal must be such that its unavoidable effect would be to prejudice the jury, forming in their minds a fixed bias and hostility toward the defendant, so that they could not

fairly weigh in his behalf such circumstances of doubt, extenuation, or degree of guilt that may be present in the case, and thus make them unable to render a true verdict."

Mr. Michael, who lived on the first floor, was agent for the Knights Life Insurance Company of America which issued industrial policies. His wife testified that "Mrs. Holt approached me about insurance . . . She said she didn't feel that her husband carried enough insurance and she would like to take out some more insurance, and when Mrs. Holt told me this I got her a couple of policies and showed her the policies and explained them to her myself." The transaction ended by the issuance of a policy on the life of Holt for $518.

There is a complaint that defendant was prejudiced by the admission of evidence of the application for insurance to a company doing business in Texas. It does not appear that any policy was ever issued, and it is not apparent why the Commonwealth offered the evidence; but we cannot see that defendant was prejudiced by it. There was only one policy of insurance shown to be in effect, that for $518, which apparently played little part in the trial. In referring to the application, the learned judge said in his opinion refusing a new trial, "One of the motives which was asserted by the Commonwealth concerned insurance upon the life of the deceased, Jesse H. Holt. The claim of the Commonwealth did not have much force and the testimony as to insurance, in the opinion of the Court, had very little to do with the verdict of the jury."

We have considered all of the assignments of error, whether separately discussed or not, and find no reversible error.

The judgment is affirmed; the record is remitted to the end that the sentence may be carried into effect.

DISSENTING OPINION BY MR. JUSTICE DREW:

After a very careful study of the record in this case I have concluded that defendant did not have a fair trial and that her motion for a new trial should be granted.

Mrs. Holt was found guilty because arsenic in a substantial amount was found in the body of her husband, and because she had purchased two small quantities of that drug, one ounce each, on February 15, and May 13, 1943, at Headlee's Drug Store in Waynesburg, where the druggist said she was "a frequent customer". Holt died May 27, 1943. At the time of these purchases she gave her correct name, and her address as 177 East High Street, Waynesburg. At the time of the first purchase she was actually living at 177 East Main Street, Waynesburg, at the home of Jennie Hessel, where she had been since her arrival in Waynesburg from Oklahoma on February 1st, 1943. She moved from there on or about March 2, 1943, and was living at 340 East Lincoln Street, Waynesburg, at the home of Mrs. Sellers, when she made the second purchase, where she remained until after the death of her husband. On May 26, 1943, at Krause's Pharmacy in close-by Washington, Pennsylvania, she purchased a small quantity, 1 dram, 60 grains, of strychnine. The druggist said she had asked for arsenic and that he told her he had none. She again gave her correct name and her address as 177 High Street, Waynesburg. This druggist said she told him she was from Oklahoma, that her husband was working on the pipe line which was being built through Waynesburg, and she then exhibited her ration book to establish her identity. All of this appears in the Commonwealth's case, and there is not anything in the entire record, other than the erroneous street address, which could in any way suggest even a suspicion that this woman was attempting to hide her identity. I think any fair examination of this testimony would force the conclusion that the error in the address could not have been intentional or of any possible advantage to evade identification, and that she did just about everything that any innocent person would do to make her identity known. This is particularly true since she was a stranger in the town, having lived there only about two weeks when she made the first purchase.

Waynesburg is a small borough with a population of less than 5000 people. The Commonwealth made much of this inadvertence. It is one of a number of small and trifling incidents which were permitted to enter the case. There is not anything to show that she ever administered arsenic or anything else to her husband. Her explanation of the reason for purchasing the arsenic was for her own hygienic use and was quite sufficient, if believed. Since only arsenic was found by the autopsy, all question of poison by strychnine or other drugs was removed by the trial judge from the case.

Almost all, if not actually all, of the facts and circumstances which led to the conviction of this woman can be more readily reconciled with her innocence than with her guilt. Her husband was a sick man; although but thirty-three years of age, he had been ill, and under the treatment of physicians for at least two years prior to his death. He seemed to have a serious gall bladder condition and it worried him considerably, he being afraid of an operation. On May 20, the Thursday before he died, he went to Doctor Walker, a witness for the Commonwealth, and arranged for an x-ray examination of his gall bladder, he having been sent there by Doctor Hart, who had seen him several times regarding his illness. He failed to keep his appointment with Doctor Walker because he could not retain the paregoric which he had been instructed by the doctor to take before returning on May 22.

Holt went to work at about six o'clock of the morning of the day he died. He returned home about eleven o'clock and said he had suffered a chill. It appears that he undressed, went into the bathroom, returned to his bedroom and went to bed. Mrs. Holt called Doctor Walker by telephone; she returned to the room and in a few minutes was heard to scream, calling the people on the first floor, Mr. and Mrs. Michael. They went up at once accompanied by their daughter, a girl of about eighteen years of age. Mrs. Sellers, the landlady, who

had a room on the same floor, also came into the apartment. They, appearing as witnesses for the Commonwealth, testified that when they arrived in the room Holt was unconscious and in a convulsion; that in two or three minutes he regained consciousness and recognized those present and called each by name, and then said: "that capsule made me so sick that I took about a half hour ago", and also "I felt pretty good about a half an hour ago". They heard him say that he was in great pain and ask them to do something for him. He immediately went into another convulsion and died in a short time.

This testimony is particularly important, because of the disinterest of the witnesses. They heard this man's statements immediately before his death and in the presence of his wife, and they could not help but see in the attitude of the husband toward the wife and in everything that happened there, that, so far as this accused is concerned, she acted throughout in a perfectly natural way under very hard circumstances. Everything indicated that Holt knew his condition was brought on by his own act and that his wife in no way contributed to the happening. If his wife had given him the capsule he would have accused her then. Everything there indicated their relationship was amicable.

Mrs. Holt testified that after she had failed to get the doctor she returned and told her husband, and that he then replied: "There is nothing the doctor can do for me, I done a terrible thing, may God be with me".

Doctor Walker arrived some ten minutes after Holt was dead. He examined him and later signed the death certificate in which he said that the primary cause of death was coronary occlusion, other conditions chronic inflammation of the gall bladder. Before he signed this certificate, he notified the coroner. This official came to the house and made an investigation, after which he informed the doctor that everything was satisfactory and that he should sign the certificate. Doctor Walker claims

that he told the coroner that there should be an autopsy. This, however, the coroner flatly denied. Following Holt's death, defendant went to the Michael apartment and remained there practically all the afternoon and evening of that day, and she spent that night at the home of friends who resided nearby. She did not return to her own apartment until the next day, and then only shortly before she left for Oklahoma, when she went there accompanied by a neighbor to get her clothes for the trip. She made no attempt to conceal or destroy anything. Her neighbors had full possession of her apartment following the death, and while she was away.

The body was sent the next night to Oklahoma. An autopsy was held there at the request of the Pennsylvania authorities, and it was found that there was an appreciable amount of arsenic in the body. When this was reported to Doctor Walker, he changed his opinion as to the cause of death as given on his certificate and said that he believed that Holt had died of arsenical poisoning, and he then attempted to give the impression that he had been of that opinion from the first. His testimony shows clearly that he was covering up what he thought was a gross mistake and for reasons of his own. His testimony, to say the least, is not reliable.

No motive for the crime was shown and the effort to prove a motive was so futile that one wonders why the district attorney in such a serious case would introduce such testimony. For instance, it was shown that shortly prior to the death a $518.00 industrial policy was taken out. This was not enough to pay the funeral and other expenses. And it was the only insurance Holt had on his life at the time of death. Also, by clearly incompetent testimony, to be referred to later, an effort was made to show an application for a $1,000.00 policy in the Great American Life Insurance Company. In addition, an effort was made to show that she would be the beneficiary of an amount collected by the fellow employees of her husband, and that she knew that. Surely the attempt to show motive because of insurance was a complete failure.

Another effort to show motive resulted in testimony that several weeks before his death Holt had an argument with his wife and struck her, and that later she made the statement that she didn't care what would happen to him, that he had killed her love. On another occasion it was shown that he had locked her out of their apartment. In other words, the wife was the innocent victim of the husband's brutality and now that is turned upon her as a motive to convict her of the most serious crime known to the law. It was shown that on one occasion she and a Mrs. Hill drove to Pittsburgh looking for their husbands, who were in the habit of going around with other women, and that coming and going they stopped for refreshments, and each had several glasses of whiskey. There is no indication that she ever used liquor to excess, but it is clear that her husband frequently became intoxicated. I think it was the same night that she returned from this trip with Mrs. Hill that Holt struck her. The majority recites this trip in detail, but I cannot see in it any motive for murder.

There were certain trial errors in the case which make, I think, the granting of a new trial necessary. Some of them were as follows: (1) The introduction of the incompetent testimony concerning embalming fluid. The court allowed a chemist to testify that standard brands of embalming fluid contain no arsenic, and that he had examined twenty such brands. This witness admitted that he had not examined the kind of embalming fluid [G. H. Shell Company] used in the Holt case. His testimony gave the jury to believe that the Holt embalming fluid had no arsenic in it, which may or may not have been true. Had this not been permitted, the presumption would have arisen that the arsenic in the body of the deceased may have come there through the embalming fluid. This alone could have raised a reasonable doubt and might have resulted in the acquittal of the accused. We said in *Commonwealth v. Danz*, 211 Pa. 507, 519, 60 A. 1070, that such question is a most material matter, re-

sulting in substantial error, for which there should be a reversal. In that case we said that the witness testifying concerning the embalming fluid was one of the most important witnesses in the case.

The majority agrees that it was error not to have stricken this testimony out, yet hold that "defendant was not prejudiced" thereby. With this I do not agree, because I think this testimony highly prejudicial. We said, in *Commonwealth v. Petrillo*, 338 Pa. 65, 97, 12 A. 2d, 317: "In ordering a new trial in this case we are not holding that there was not sufficient competent evidence offered to warrant a conviction, but we are holding that there was such an admixture of competent and incompetent evidence in the testimony admitted as to deprive the defendant of the fair and impartial trial which every accused in an American court of justice is entitled to. It is the duty of the appellate courts to see to it that every defendant gets such a trial. This Court said in *Logue v. The Commonwealth*, 38 Pa. 265, 269, in an opinion by Justice THOMPSON: 'It was suggested on the argument here, that even if there was error in the particulars discussed, it did the prisoner no harm, as the jury found him to be guilty of a wilful, deliberate, and premeditated murder, and therefor the law of self-defense could have no application to his case. This suggestion is more plausible than sound. It would be very unsafe to prove the accuracy of all the steps in a trial by the result of the verdict. *Who can tell what the result might be in any given case where there is error in some of its parts?* The result might be accurate, but it would probably be accidental. *The law does not conclude parties and rights upon such uncertain grounds.* Its utmost effort is accuracy, as far as it may be attained through fallible agencies, and then its mission is complete, and its conclusions irrevocable." (Italics added.)

(2) The learned trial court failed to properly charge on the subject of circumstantial evidence. He did not make clear "to the jury the nature of circumstantial

evidence, and in language understandable to lay minds the jury should have been instructed that if the evidence could reasonably be explained on any other theory than that of the guilt of the accused, she should be acquitted": *Commonwealth v. Giovanetti,* 341 Pa. 345, 359, 19 A. 2d 119. This Court said in *Commonwealth v. Bardolph,* 326 Pa. 513, 521, 192 A. 916, quoting with approval the following from *Commonwealth v. Benz,* 318 Pa. 465, 472, 178 A. 390: "When a charge of crime is sought to be sustained by circumstantial evidence, the hypothesis of guilt should flow from the facts and circumstances proved, and be consistent with them all. The evidence must be such as to exclude to a moral certainty every hypothesis but that of guilt of the offense imputed; the facts and circumstances must not only be consistent with and point to the guilt of the accused, but they must be inconsistent with his innocence." The trial court should have charged in almost this identical language so that the lay minds of the jury could understand that if the evidence against the accused could be reasonably explained on any other theory than that of guilt the accused must be acquitted. The trial court touched upon this subject in its qualified affirmance of defendant's seventh point, but in a way that was confusing and of little or no help to the jury. I think defendant was prejudiced by the inadequate manner in which this important subject was handled.

(3) The court erred in allowing the introduction of Holt's application for insurance made to the Great American Life Insurance Company. The application was secured from its office in Texas by a Pennsylvania State Policeman. He brought it to court and the trial judge permitted it to be introduced in evidence. No agent or representative of the company appeared to testify to anything concerning it. The action of the court in this respect was nothing better than the admission of pure hearsay testimony. If the jury could imagine anything in the way of motive from the testimony concerning in-

surance, the admission of this incompetent application was decidedly prejudicial to the accused. The majority, conceding that it was error to have admitted this evidence, hold, however, that such testimony "had very little to do with the verdict". Who can say what effect the testimony regarding insurance had on the verdict of the jury? The attitude of this Court seems to me to be pure assumption, nothing better than a guess, and one in which the Court should not indulge.

(4) The majority says that the accused was not prejudiced by the refusal of the trial court to charge that conviction could only follow their being convinced beyond a moral certainty of the guilt of accused. This would seem to approve the dropping of this phrase out of the law as being the equivalent of "beyond a reasonable doubt". I think it a bit too late in the day, under our decisions, to say that one is the equivalent of the other—that each mean the same thing. In one of our recent cases, *Commonwealth v. Libonati*, 346 Pa. 504, 508, 31 A. 2nd 95, Mr. Justice PATTERSON said: "The requirement of the law is that in order to warrant a conviction the facts and circumstances proved must be of such character as to produce a moral certainty of the guilt of the accused beyond any reasonable doubt". See *Commonwealth v. Giovanetti*, supra. This is a correct statement of the law as it exists today, and therefore, the lower court erred in failing to follow it.

I think that it is very doubtful that the corpus delicti was proven; also that even if the case had to be submitted, and I think this was necessary, the testimony against the accused was so weak that in a fair trial she would be found not guilty because of the reasonable doubt. She was perhaps unfortunate beyond her deserts by reason of the "hue and cry" in this small community against a woman who was charged with a cowardly and atrocious crime.