## Commonwealth v. Driscoll

*Charles D. Coll,* for Commonwealth.

*S. V. Albo* and *Marjorie H. Matson,* for defendant.

LEWIS, J., June 22, 1955.—This matter comes before the court on a motion in arrest of judgment and a motion for a new trial.

Defendant was indicted for misdemeanor in office, the indictment alleging 11 counts.

Defendant was tried and convicted on all 11 counts.

The counts, as set forth in the indictment, read as follows:

"*Count 1.* February 14th, 1949. That defendant did wilfully and unlawfully let a contract in 1949 for coal for Highland Park Zoo; said bid not going to the lowest responsible bidder, Edward Witzberger (E W Coal Company).

"*Count 2.* February 14th, 1949. That defendant did wilfully and unlawfully let a contract in 1949 for coal for the Municipal Hospital; said bid not going to the lowest responsible bidder. Edward Witzberger (E W Coal Company).

"*Count 3.* That the defendant did wilfully and unlawfully let a contract for coal on the 14th day of February 1949 for years delivery of coal to locations as later ordered; said bid not going to the lowest responsible bidder. Edward Witzberger (E W Coal Co).

"*Count 4.* That defendant did wilfully and unlawfully let a contract in February 14th, 1949 for coal for the Carnegie Free Library of Pittsburgh; said bid not going to lowest responsible bidder. Edward Witzberger (E W Coal Co.).

"*Count 5.* February 14th, 1949. That defendant did wilfully and unlawfully let a contract in 1949 for coal for Engine House No. 24; said bid not going to the lowest responsible bidder. Edward Witzberger (E W Coal Company)

"*Count 6.* February 14th, 1949. That defendant did wilfully and unlawfully let a contract in 1949 for coal for Engine House No. 34; said bid not going to the

lowest responsible bidder. Edward Witzberger (E W Coal Co.).

"*Count 7*. January 17th, 1947 and divers dates thereafter to December 31st, 1950. That the defendant did wilfully, unlawfully and corruptly fail to inspect and institute inspection and testing procedures for coal in accordance with specifications, in accordance with the provisions of the non-smokeless coal contract specifications.

"*Count 8*. December 31st, 1947 and on divers dates subsequent thereto until the 31st day of December 1950. That defendant did wilfully, unlawfully and corruptly accept strip mine coal as substitute for deep mine coal by the City of Pittsburgh being prohibited under the terms of the contracts entered into by the said City of Pittsburgh from December 31, 1947 until December 31, 1950.

"*Count 9*. January 17th, 1947 and on divers days subsequent thereto, defendant unlawfully and wilfully did permit substitution of coal from other mines than those specified as the source of the coal to be furnished and delivered under said contract.

"*Count 10*. January 17th, 1947. That defendant did unlawfully and wilfully fail to authorize a scale to weigh the coal delivered under said contracts, it being his duty under said contracts to authorize a scale to weigh said coal.

"*Count 11*. January 17th, 1947. That defendant did unlawfully and wilfully fail to weigh or cause to be weighed enroute to destination, the coal delivered under said contracts."

After defendant was convicted, a motion for a new trial and a motion in arrest of judgment was filed in his behalf and argued before the court en banc.

The first six counts of the indictment all alleged that defendant on February 14, 1949, let contracts for the purchase of coal to one not the lowest responsible bidder

in violation of the Act of July 28, 1941, P. L. 545, para. 1, 53 PS §9531.

In order to endeavor to sustain the charge that defendant had violated the law by letting the contracts to one not the lowest responsible bidder, the Commonwealth introduced evidence to prove that the director of supplies in December of 1948 advertised for bids to supply coal for the year 1949 to the Highland Park Zoo, the Municipal Hospital, the Carnegie Free Library of Pittsburgh, Engine House No. 24, Engine House No. 34 and for one other location to be named later. Four bids were received, but were rejected on the ground that they were excessive. Under the specifications, the city had the right to reject all bids.

The city readvertised in January, 1949, and five companies put in bids. The director's judgment in rejecting the first set of bids was vindicated when the award resulting from the second set of bids resulted in a savings for the City of Pittsburgh in the sum of $40,000.

The lowest bidder was to be determined on a formula basis, depending on the heat units in a ton of coal, and not on a low bid per ton in dollars and cents.

Under the formula method of computing the price per ton, Panza Bros. was the low bidder.

Each bidder was required to set forth in its bid the source of the coal it proposed to furnish, the number of B. T. U.'s per pound of dry coal and the ash, moisture and sulphur content.

The bidder, according to the specifications, was to be determined by a formula to give effect to the analytical analysis of the coal offered by the bidders in the terms of the cost per million B. T. U.'s.

When defendant received the bids, instead of applying the formula to determine the lowest bidder, he went over the list of bidders to determine who were responsible as he was required to do under the law. He

eliminated the Panza Bros. because they were not responsible bidders and awarded the bid to the E. W. Coal Company. He did not actually apply the formula theory in comparing the E. W. Coal Company bid with the remaining three bidders because it was obvious on the face of the bids, taking into consideration the source of the coal of the other bidders and the prices submitted by them, in comparison with the price submitted by the E. W. Coal Company, that the E. W. Coal Company was the low bidder, whether the formula theory was applied or the price per ton method was adopted.

The Commonwealth did not contend, nor did it prove, as between the E. W. Coal Company and the three other bidders, that the E. W. Coal Company was not the low bidder applying the formula method of computation of bids.

The Commonwealth merely says that defendant did not use the formula method in comparing the bids before eliminating Panza Bros., who were, in fact, the lowest bidder under the formula method of computation, and therefore, defendant violated one of the provisions in the proposal.

It further contends that eliminating Panza Bros. as a responsible bidder was an abuse of discretion, and that fact plus the fact that the formula method was not actually used in computing the bid of Panza Bros. constituted a misdemeanor in office, because it was done with a corrupt intent.

Under the statute, the director was required to award the bid to the lowest bidder, provided the lowest bidder was responsible.

If he was not responsible, the director had an equal duty of eliminating him entirely.

Therefore, it was the director's primary duty to determine which bidders were responsible and which bidders were not responsible.

In this case, the director determined that Panza Bros. were not responsible, and after that conclusion was reached, it would have been an useless act to determine their bid by the formula method or any other method, because if Panza Bros. were not responsible they could not legally be awarded the contract.

Therefore, it was not a violation of a duty imposed on the director merely because he did not compute the bid of a bidder who he had determined was not responsible.

If, however, he abused his discretion in eliminating Panza Bros, as a bidder, and this was done with a corrupt intent, then he would be guilty of a misdemeanor in office.

The law seems to be clear that misfeasance in office cannot be charged except for a breach of a statutory duty or for the performance of a discretionary act with an improper or corrupt motive: McNair's Petition, 324 Pa. 48. The reason for this, according to the decision in the case of Commonwealth v. Hubbs (No. 2), 137 Pa. Superior Ct. 244, is that public officers should not be hampered in the performance of their duties by the fear of criminal prosecution for an error in judgment committed in good faith.

The Commonwealth, in order to prove that defendant in awarding the bid to the E. W. Coal Company in 1949 abused its discretion, and that this was done with a corrupt motive, introduced into evidence a series of transactions relating to the award of bids for coal beginning in 1947, and contends that a succession of inferences of corrupt intent could be reasonably inferred therefrom.

While the appellate courts hold an inference may be predicated on inference: Neely et al. v. Insurance Co., 322 Pa. 417; it is equally true when a case is based solely on a succession of inferences, conjectural

in their character, then it should not be submitted to the jury: Henderson v. National Drug Co. et al., Appellants, 343 Pa. 601.

It is incumbent on us, therefore, to examine each transaction complained of to determine its legality and with a view to determining if an inference of corrupt intent could be inferred therefrom.

It is also incumbent on us to examine all the transactions collectively to see if an inference of corrupt intent can be drawn.

The Commonwealth relied on the following evidence in an endeavor to prove an inference of corrupt intent:

1. In 1947, the director advertised for bids for the coal supply for the coming year, and when the bids were received, the E. W. Coal Company was the low bidder for all locations to be furnished coal, except for the Ross Pumping Station.

The bids, however, all contained an escalator clause making the prices subject to increase if the miners' scale went up. The bids were rejected and readvertised. The E. W. Coal Company was the low bidder for all locations, and the bid was awarded to it.

2. For the year 1948, the director advertised for bids, and only one bid was received. This bid was from the E. W. Coal Company, and the contract was awarded to it.

3. The Commonwealth offered evidence to prove that in the years 1947, 1948, 1949 and 1950, practically all the city's coal was furnished by the E. W. Coal Company.

4. The Commonwealth offered evidence to prove that the City of Pittsburgh bought 46,892 tons of coal from the E. W. Coal Company in 1947, after it was determined that it was the low bidder among three bidders, for the total amount of $282,700. In 1948, the E. W. Coal Company was the sole bidder, and the

contract for 49,892 tons of coal, costing $384,124, was awarded to it.

The contract for 1949, on which there were five bidders, covered 38,740 tons of coal, at a total cost of $233,845, and it was awarded to the low bidder, the E. W. Coal Company. In 1950, the E. W. Coal Company again was the sole bidder, and agreed to furnish 35,233 tons of coal at a total cost of $270,270. However, the contract awarded in 1950 was for washed coal and not simply dry coal, as hereinbefore purchased by the city.

In connection with the aforesaid coal contracts, the Commonwealth offered evidence that between 1946 and 1950, the price per ton for coal arose approximately 22 percent, from $3.43 in 1946 to $4.08 in 1950.

5. Evidence was produced that in 1950, the city changed its specifications for the purchasing of coal so as to eliminate all coal from consideration, except washed coal, when only two companies, including the E. W. Coal Company, had equipment to wash the coal.

The Commonwealth contended, from the aforementioned evidence, that the jury would be justified in finding that defendant, in awarding the 1949 contract to the E. W. Coal Company, acted from an illegal and corrupt motive and, therefore, is guilty of misdemeanor in office.

When the director received the bids for the 1949 coal contract, he had a positive statutory duty to award the contract to the lowest bidder, providing the low bidder was responsible. The director also had an equally important statutory duty to determine whether the low bidder was responsible. If he was not responsible, it was the director's duty to eliminate him entirely from consideration. The word "responsible", as used in the Act, applies not only to pecuniary ability but also to judgment and skill: Reuting et al. v. Titusville, 175 Pa. 512.

The director, after receiving the bids, and not having any knowledge of Panza Bros. or their ability to perform, quite properly instituted his own investigation to determine their responsibility. According to the testimony of the director, his investigation disclosed that Panza Bros. had limited facilities for stock piling and delivering coal, and that they never had handled a large contract for a municipality.

He further determined that it would be necessary for Panza Bros. to assign their contract for the coal to the mine before they could get any coal. The director then determined, according to his testimony, that the proposal of Panza Bros. certified that they intended to deliver coal from a Freeport vein with an ash content of 4.5, when the information which he had in his files indicated that the ash content of Freeport coal was much higher. After considering all these facts, the director then came to the conclusion that Panza Bros. were not responsible bidders, and awarded the contract to the E. W. Coal Company.

Whether defendant abused his discretion in eliminating Panza Bros. from the bidding, because they were not responsible bidders, would ordinarily be a question of fact to be determined by a jury.

If defendant did obtain this information in regard to the responsibility of Panza Bros., and, nevertheless, insisted on awarding them the contract, he would be open to severe censure and probable prosecution if they defaulted on their contract and failed to deliver coal to the aforesaid public buildings. His opinion as to their lack of financial responsibility and ability to perform was strengthened by the testimony of Ralph H. Rohrich, a witness called by defendant. Mr. Rohrich, general agent for the Peerless Casualty Company, testified that he wrote the bid bond for Panza Bros. and when the applicants for the bond filed their finan-

cial statement they failed to disclose they were obligated to the Pittsburgh Coal Company in the amount of $9,000 or that they were obligated for a piece of machinery in the amount of $700. Furthermore, the financial statement filed with the bonding company stated that the net worth of the two Panza Brothers amounted to $22,000, and yet they were bidding on a contract totaling almost $233,000, which involved the delivery of 38,740 tons of coal to important public buildings.

How a jury could find the Panza Bros. responsible bidders in view of this testimony is hard to imagine, but as they are the judges of the credibility of the witnesses, it was their duty to determine if the director abused his discretion in awarding the contract to the E. W. Coal Company. If they found in the affirmative, then they would have to go one step farther and find he abused his discretion from an illegal or corrupt motive.

"Corrupt" has been defined in Webster's New International Dictionary, 2nd Edition, as "crooked or dishonest".

It is the contention of defendant that the record on that point is entirely devoid of any evidence that would warrant a jury in finding an illegal or corrupt motive and the case should not have been submitted to the jury on this point.

The evidence submitted in connection with the awarding of the 1947 coal contract is entirely devoid of any wrongdoing by defendant. He properly advertised for bids. He properly rejected the bids when they contained an escalator clause, because they were not a firm bid. He readvertised the bids according to law and awarded the contract to the lowest bidder.

There was nothing illegal or improper in the way the contract was handled.

In 1948, the director properly advertised for bids and only one bid was received. This contract was awarded to the lone bidder.

The director fully complied with the law in advertising for bids and awarding them to the lowest bidder even though only one bid was received. The Commonwealth seems to contend that the jury could infer a corrupt intent from the fact that defendant did not readvertise when he received only one bid in 1948 and 1950.

The evidence that the E. W. Coal Company was the low bidder in 1947, 1948, 1949 and 1950 raises no inference of illegality in view of the fact that the bids were properly advertised and the E. W. Coal Company was the lowest responsible bidder.

The inference of corrupt motive that the Commonwealth attempts to draw because of the fact that when the E. W. Coal Company was the sole bidder, the bid was higher than in the preceding year when there was competitive bidding, is without merit when the evidence clearly indicates during these years the coal business was unstable and the further fact that there was a price rise in the market between 1946 and 1950 of 22 percent per ton, and from the further fact that the bid in 1950 was a bid for washed coal and not dry coal as had been furnished previously to the city.

The evidence that the specifications were changed in 1950 to include only washed coal when the E. W. Coal Company and one other company were the only companies equipped to wash the coal has no probative value in proving corrupt motive, when the evidence clearly proved that the water department of the city changed the specifications to include washed coal.

A review of this entire evidence submitted by the Commonwealth to establish a corrupt motive relevant to counts 1 to 6 inclusive clearly indicates that it falls

far below the standard required to prove corrupt intent.

Every single act in the series of transactions relating to the awarding of coal contracts from 1946 to 1950 was a legal transaction. Any inferences of corrupt intent that might be drawn therefrom would be pure conjecture.

In the case of New York Life Insurance Company v. McNeely (Ariz.) 79 P. (2d) 948, the court said: "The courts, however, have always insisted that the life, liberty and property of a citizen should not be taken away on possibilities, conjectures, or even, generally speaking, a bare probability . . ."

Therefore, it is our opinion that the motion in arrest of judgment should be granted on counts one to six inclusive.

Count 7 charges defendant with failure to inspect and to institute testing procedures. In order to prove defendant guilty of the charge set forth in this count, it was incumbent on the Commonwealth to prove beyond a reasonable doubt that defendant had a duty to inspect the coal and his failure to do so was due to a corrupt intent. There was no statutory duty imposed on the director to inspect the coal or to set up testing procedures. In the specifications accompanying the proposal, however, there is a provision which puts the successful bidder on notice that certain tests and inspections would be made of the coal furnished under his contract from time to time.

There is nothing in the specifications which says that the director of the department of supplies shall make the tests or the inspections. It merely states that they shall be made and the final analysis of the coal shall be made by the Bureau of Tests of the City of Pittsburgh. This bureau does not come under the supervision of the supplies department but under the supervision of the department of public works.

The contracts for the delivery of supplies to the various departments of the City of Pittsburgh are entered into by the City of Pittsburgh, a municipal corporation. The city council and the mayor could delegate certain duties and powers to the various departments of the city unless those duties and powers were expressly delegated by statute.

The Commonwealth's own testimony revealed that the inspection of purchases made by the City of Pittsburgh had been delegated to the city controller since 1911.

Mr. John Lang, a former employe of the City of Pittsburgh, who was the chief clerk of the department of supplies from 1910 to 1952, testified on behalf of the Commonwealth. He said that in 1911, the New York Municipal Research Agency was hired by the City of Pittsburgh to make a survey of the various departments of the city and to make recommendations for their improvement.

He testified that the research agency recommended that the city inspectors employed by the department of supplies be transferred to the city controller because it was a bad policy to have the director of supplies employ and control inspectors who would be checking on his purchases.

He stated that the recommendations were accepted by city council, and since 1911 there were no inspectors in the department of supplies, and that all inspectors were hired and controlled by the city controller.

The Commonwealth called as a witness Mr. Joseph Priester, who had been an inspector under a former city controller. He testified in detail as to how he had inspected the purchases of coal for the city controller.

This testimony was followed by the testimony of Oscar Robin, a witness for the Commonwealth. He said that he was the present coal inspector for the city

controller, and he related what his duties were in this connection.

The testimony offered by the Commonwealth revealed that when coal was delivered by a supplier, it was receipted for by a city employe of the department receiving the coal. This receipt then was turned over to the head of the department receiving the coal and then in turn over to the department of the city controller, whose inspectors checked the delivery slips against the invoices. The delivery slips were kept by the department of city controller and at no time turned over to the department of supplies.

It was clear that the department of supplies had not inspected purchases since 1911 and was not equipped to do so.

Whether the proper inspections were made is not an issue unless it was the duty of the director to make the inspections.

It seems clear that the director of supplies had no such duty. City council had seen fit to place a responsibility on another department, over which the director of supplies had no control. Therefore, as the director had no duty to inspect, he could not be charged with a violation of such duty, and therefore, count 7 must necessarily fall.

Count 8 alleges that defendant willfully, unlawfully and corruptly accepted strip mine coal as a substitute for deep mine coal in violation of the specifications, and count 9 says that defendant unlawfully and willfully permitted coal from mines other than specified in the contract to be substituted in violation of the contract.

Under the contract, substitution of coal from other mines was permitted if the director gave his approval.

While the Commonwealth charged defendant with willfully and unlawfully accepting coal from mines

not specified in the contract and from strip mines, the Commonwealth's own witness, Edward Wirtzberger, president of the E. W. Coal Company, testified that it was absolutely necessary to obtain other sources of supply because of the labor conditions at the Maude Mine, and that the director did not know that this coal was being substituted.

The Commonwealth proceeded on the theory that it was the duty of the director to know strip coal and coal from another source, other than the source specified in the contract, was being substituted, and that this could have been discovered if an inspection of the coal was being made.

There again the Commonwealth endeavored to saddle on the director a duty which the city council had taken from him, namely, the inspection of coal.

It is obvious that counts 8 and 9 cannot stand because each are based on a false theory of the director's duty, and because the Commonwealth's own evidence proved conclusviely that the director neither knew nor condoned the delivery of strip coal or coal from another source other than that of the Maude Mine.

Counts 10 and 11 allege that defendant failed to authorize a scale to weigh the coal, as set forth in the specifications, and that he in fact failed to weigh the coal en route to destination, as provided in the specifications.

The specifications provided that the coal was to be weighed on a scale authorized by the director.

The evidence revealed that the City of Pittsburgh had no scale nor did it have a weighmaster. Therefore, any scale to be authorized by the director must necessarily be a scale owned by some company or private individual.

While the evidence revealed that defendant did not actually authorize the coal to be weighed on a scale

owned by an individual or corporation by notifying the supplier either in writing or orally, he did acquiesce in the weighing of the coal on the scale at the mine owned by a company other than that of the supplier, which scale had been authorized by his predecessor in office. The weighmaster at the mine was a licensed weighmaster, employed by the mine owner, whose scale was periodically inspected by the county weights and measures department.

There was some evidence to the effect that on a number of occasions the supplier took the coal to his yard and weighed it on his own scale. There was no evidence that the director had knowledge of this, and there was no way he could have discovered it under the system set up to check on the weight slips.

As stated previously, the weight slips were never turned over to the department of supplies but were sent by the department receiving the coal to the city controller's office for inspection by his inspectors. It seems clear that this system of checking weights, which had been in operation for at least five years before defendant took office, inferentially placed the burden of checking weights on the inspectors in the city controller's office and not on defendant.

Therefore, counts 10 and 11 must fall, because there was no duty imposed on defendant as contained in those counts, which he failed to perform.

Even if it be conceded that certain duties were imposed upon the director by the specifications for the purchase of coal, as set forth in counts 7 to 11 inclusive, these duties were not statutory duties but duties imposed on an employe by the employer, namely, the City of Pittsburgh, and therefore, the Commonwealth would necessarily have to prove beyond a reasonable doubt that he willfully failed to perform those duties and with a corrupt intent.

A violation of departmental regulations which do not have the force of statute does not render an officer liable to prosecution for willful omission to perform a duty "enjoined by law": 43 Am. Jur., Public Officers, §329.

If that be true, then the failure to carry out certain specifications in a contract would not render an officer liable unless the proof offered was clear, concise and indubitable that the officer acted corruptly.

The word "corruptly" as applied to officers signifies the doing of an act with intent to obtain an improper advantage inconsistent with official duty and the rights of others: 67 C. J. S., Officers, §133.

We are unable to find in the entire record one bit of evidence that would even remotely indicate defendant obtained any advantage whatsoever in awarding these contracts to the E. W. Coal Company and the handling of the purchases.

There was not one bit of evidence introduced that would indicate defendant was the recipient of any type of remuneration or that he received any favor whatsoever from the seller.

To permit a jury to infer that the director gained any advantage from his manner in dealing with the seller was to permit them to do the wildest kind of guessing, which, of course, is not permitted under our rules of evidence.

A study of the cases in Pennsylvania where a conviction for misdemeanor in office was permitted to stand reveals that there was not one as weak and unconvincing as the instant case.

In Commonwealth v. Rosser et al., 102 Pa. Superior Ct. 78 (1930), defendants, who were the County Commissioners of Luzerne County, failed to perform a duty imposed upon them by statute, namely the failure to advertise bids before awarding a contract.

In Com. of Pa. v. Kline, 107 Pa. Superior Ct. 594 (1939), a direct statutory duty was violated. Bids were not advertised. The contract was not in writing and the items purchased were paid for before delivery.

In Commonwealth v. Brownmiller, 141 Pa. Superior Ct. 107 (1940), the secretary of highways employed over 9,000 employes in Luzerne County before the election, a great majority of whom did no highway work but aided in the political campaign.

In Commonwealth v. Knox, 172 Pa. Superior Ct. 510 (1953), defendant, a magistrate, failed to carry out a direct statutory duty by failing to follow certain procedures regarding real estate bonds.

In Commonwealth v. Fahey et al., 156 Pa. Superior Ct. 254 (1954), the school board took a bid for part of the supplies and orally awarded the contract for the balance of supplies. In addition, there was evidence of kickbacks to members.

The Supreme Court in the case of Commonwealth v. Bausewine, 354 Pa. 35 (1946), in reversing the conviction of a police chief in Norristown for accepting bribes not to raid a club had this to say on a case based wholly on circumstantial evidence:

"The burden devolved upon the Commonwealth to overcome the presumption of defendant's innocence and to establish, beyond a reasonable doubt, the fact that he had accepted money to influence him as a police officer to act contrary to known rules of honesty and integrity. While the mere fact that the evidence adduced is wholly circumstantial is not fatal to the Commonwealth's case (Com. v. DePetro, 350 Pa. 567, 577, 39 A. 2d 838), yet it must be remembered that guilt must be proved and not conjectured. The reasonable inference of guilt must be based on facts and conditions proved; it cannot rest solely on suspicion or surmise. These do not take the place of testimony. The

facts and circumstances proved must, in order to warrant a conviction, be such as to establish the guilt of the defendant, not necessarily beyond a moral certainty, nor as being absolutely incompatible with his innocence, but at least beyond a reasonable doubt. The circumstantial evidence in this case is not such 'as reasonably and naturally to justify an inference of the guilt of the accused, . . . and of such volume and quality as to overcome the presumption of innocence and satisfy the jury of the accused's guilt beyond a reasonable doubt': Com. v. Marino, 142 Pa. Superior Ct. 327, 16 A. 2d 314; Com. v. Libonati, 346 Pa. 504, 508, 31 A. 2d 95; Com. v. Holt, 350 Pa. 375, 387. The testimony adduced by the Commonwealth is weak and inconclusive."

Therefore, we are of the opinion that a review of the testimony produced in the instant case is so weak and inconclusive that a conviction resting on it would be a conviction resting on suspicion and surmise and would be a miscarriage of justice.

We are, therefore, granting the motion in arrest of judgment on all counts.

### Order of Court

And now, to wit, this June 22, 1955, the motion in arrest of judgment is granted and defendant, William Driscoll, is hereby ordered discharged.

Eo die, exception noted to plaintiff, Commonwealth of Pennsylvania, and bill sealed.

BRAHAM, P. J. (Specially Sitting), June 22, 1955.— I dissent from the majority opinion. Defendant, the Director of the Department of Supplies of the City of Pittsburgh, was indicted on October 2, 1951, for misdemeanor in office following the grand jury investigation of that year. He was tried and convicted on April 20, 1954, on all 11 counts of the indictment. De-

fendant's motions in arrest of judgment and for a new trial are now before the court en banc.

The first six counts of the indictment charge that defendant "wilfully and unlawfully" let contracts for the furnishing of coal for the City of Pittsburgh for the year 1949 to other than the lowest responsible bidder, the several counts specifying coal for various buildings. The last five counts charge that defendant did "wilfully and unlawfully" "fail to inspect and institute inspection and testing procedures for coal in accordance with the specifications", 7th count, accept strip mining coal as substitute for deep mine coal", 8th count, "permit substitution of coal from mines other than those specified in the contract", 9th count, "fail to authorize a scale to weigh coal", 10th count, "fail to weigh coal enroute to destination", 11th count. The verdict, as has been said, was guilty on all counts.

Not only did defendant fail in all cases to award the contract according to the formula provided by the contract, he also, as the Commonwealth contends, manipulated the award so that the favored one, Edward Witzberger, would get the contract. The Commonwealth shows that in 1946 Witzberger, trading as E. W. Coal Co., first supplied the city with coal, 100 tons of it. In 1947 he was not the low bidder but rebidding was required and he became the low bidder. In 1948 Witzberger was the only bidder. The price was $1.75 per ton higher than in 1947 but no new advertisement was ordered. In 1949 he was not the only bidder and not the low bidder. This time the bids were rejected and readvertisement required although the price was $1.30 per ton lower than the price in 1948. In 1950 Witzberger was the only bidder. The bids were not rejected and no readvertisement directed although his price was $1.46 higher than the price in

1949. Evidence as to the years other than 1949 was admitted to show plan and intent.

Further the Commonwealth was able to show that defendant did not test the coal regularly as required by the contract and in effect made no tests at all, allowed Witzberger to furnish coal from strip mines in such quantities as, and whenever, he desired, although the contract excluded such coal, allowed Witzberger to furnish coal from any source he chose although he was limited to the mines specified in the contract, never authorized a scale to weigh the coal although the contract provided therefor, never weighed the coal at its destination or en route but depended at all times on the weight given him by the seller although the contract contemplated weighing on the city scales or the scales of a disinterested person approved by the city.

Misdemeanor in office is a common law offense. In McNair's Petition, 324 Pa. 48, 55, it was said: "Malfeasance in office cannot be charged except for breach of a positive statutory duty or for the performance of a discretionary act with an improper or corrupt motive."

In the case at bar the two classes of offenses are illustrated. The obligation to buy supplies for the public by open bidding, where required by statute, is a positive statutory duty. If this is omitted willfully the offense is made out. The first six counts of the indictments charge failure to let contracts for coal to the lowest responsible bidders. This situation involves: First, the duty to determine who are responsible bidders, a discretionary duty for violation of which defendant is to be held liable only if he acts corruptly and unlawfully, and, second, the duty to award the contract to the lowest responsible bidder, a duty of a mandatory character, for violation of

which defendant may be liable if he acts willfully and unlawfully.

The offenses charged in the last five counts of the indictment charge offenses as to which there is an obligation imposed by the contracts signed by the city such as the duty to weigh and inspect the coal but no positive statutory duty. Accordingly these offenses have been considered only if committed corruptly, that is with an evil intent as distinct from mere willfulness.

All of these matters were submitted to the jury in a charge as to which there is no complaint. The only contention is that the evidence does not support the charge of corrupt conduct.

One question which obtrudes from this record is whether, if a public officer has classified bidders for public work as responsible bidders and bidders not responsible and has not disqualified one who is apparently low bidder as being not responsible, he may then be found guilty of malfeasance in office by willfully refusing to award the contract to him as low bidder. Most of the cases have involved proceedings in equity; there are few precedents in the criminal courts on the subject.

There is no doubt as to the discretion of the public officer to classify bidders as responsible or not and to refuse to award a contract to one whom they believe to be an irresponsible and unfit person to serve the public in the manner specified by the bid: Wilson et al. v. New Castle City et al., 301 Pa. 358, 364. The public officer is entitled to the benefit of the presumption that he has done his duty: Com. ex rel. Snyder et al. v. Mitchell et al., 82 Pa. 343, mandamus; Findley v. City of Pittsburgh, 82 Pa. 351, equity; Douglass et al. v. Com. ex rel. Senior, 108 Pa. 559, mandamus. However, he may not vary the legal requirements of the contract in favor of one bidder. This would be not only discriminatory but culpably violative of the law:

Harris v. Philadelphia et al., equity, 283 Pa. 496; McIntosh Road Materials Co. v. Woolworth, etc., et al., 365 Pa. 190, 203.

There comes a time when, having exhausted his discretion in classifying bidders, the public officer is face to face with the decision to award the contract to the lowest responsible bidder or to refuse. At this point the law as stated in Smith v. City of Philadelphia, 227 Pa. 423, 431, becomes applicable.

" 'The infirmities of human nature, the natural disposition to favor friends, personal and political, and the various motives which influence public officers to depart from a strict and rigid adherence to the obligations that rest upon them as representing the public, make it important that they should be held strictly within the limits of the powers conferred upon them'."

In the case at bar the verdict of the jury, under the instructions of the court, establishes that defendant did not use his discretion to classify Frank C. Panza, the low bidder under the formula, as not a responsible bidder, but instead refused to apply the formula provided by the contract and willfully and corruptly refused to award the contract to the lowest bidder. To be sure, defendant has an explanation at every point but the Commonwealth's case and defendant's explanation are for the jury: Com. v. Fahey et al., 156 Pa. Superior Ct. 254, 259; Com. v. Rosser et al., 102 Pa. Superior Ct. 78.

Defendant, facing this situation, contends that "as to all counts of the indictment the Commonwealth was required to prove that the defendant acted corruptly and with an evil intent". The clash comes when defendant contends that all the facts shown are insufficient to show bad intent on the part of defendant.

Were defendant's manifold failures to comply with the law, including the requirements of the contracts signed by the city willful and corrupt? The number of

his defaults alone throws light on the problem. Defendant never computed the bids according to the formula provided by the contract. He never weighed the coal at a disinterested scale, a matter as to which the jury expressed keen interest. He never provided a scale for the weighing. He allowed the coal dealer to furnish coal from mines other than the agreed mines whenever he chose and without consulting defendant. He allowed the dealer to furnish strip mine coal instead of deep mine coal whenever he chose and without consulting defendant. The contracts required periodic and regular tests to determine whether the city was getting the coal it was paying for. He made no tests and caused none to be made.

It is argued that defendant as director of the department of supplies had no one to make the tests; the inspectors were in the controller's office. Defendant cannot relieve himself of his responsibility this easily. Before he took delivery of the coal it was his duty to make sure the city got what it was paying for.

The opinion of the majority of the court en banc arrives at the conclusion that there is no evidence to support the verdict of guilty by the simple expedient of ignoring all but defendant's evidence. This is in direct violation of the rule that the evidence on motion in arrest of judgment is to be construed most strongly against defendant.

This erroneous view on the part of the majority of the court may be demonstrated by going at once to the failure of defendant to award the contract to the lowest responsible bidder. The trial judge charged the jury that it was the first duty of defendant as director of supplies, before awarding the contracts for coal for the year 1949, to determine what bidders were qualified bidders. In determining whether a bidder was a qualified bidder defendant was to be held only to an honest exercise of his discretion. Then having

established the list of qualified bidders, it became the positive duty of defendant to award the contract to the lowest bidder according to the formula established by the specifications. The trial judge submitted the question of the good faith of defendant to the jury. The verdict of guilty must be taken as establishing lack of good faith on defendant's part.

Arthur C. Meyers, chief clerk of defendant's department, admitted that, on the face of things, Panza Brothers were the low bidders in 1949 under the formula although E. & W. Coal Co. was the low bidder on a dollar basis. However, say defendant and Meyers, Panza Brothers were disqualified because they were not responsible bidders. The strange thing is that no official record of any kind showing the disqualification of Panza Brothers was ever made. Indeed there was no writing of any kind evidencing the fact. Panza Brothers were never notified that they were disqualified.

It is a dangerous situation if a public official who is responsible for buying millions of dollars worth of supplies for a great city can withhold the fact that one ostensibly the low bidder has been disqualified until the contract has been let and performed. The only safe procedure is for him to decide openly and with finality the class of responsible bidders and then award the contract to the lowest one. Anything else leads directly to the suspicion that the official has favored one bidder and then invoked the disqualification of the lower bidder as an afterthought to protect himself.

The jury in the case at bar may have entertained just that view. There is evidence to support it. Frank C. Panza, the low bidder, who was denied the contract, testified that he never talked to William Driscoll, defendant, before trial. Driscoll testified that he had a full conversation with Panza about Panza's ability to carry out the contract. He said this was his custom

with a new bidder. But defendant admitted that he had never talked to Edward Witzberger, owner of E. & W. Coal Co., to whom he awarded this and prior contracts, although before Driscoll granted him the first contract he had sold the city about 100 tons and was a small dealer like Panza Brothers.

Furthermore, Driscoll's expressed concern about seeing that Panza really could furnish the coal he promised from the mines he specified in his bid contrasts strangely with his after failure to do anything to protect the city against Witzberger. After Witzberger had the contracts defendant allowed Witzberger to furnish up to 40 percent of strip coal in one year, although the contract forbade all the strip coal and defendant said he never knew anything about it. He had a complaint about one load of coal that was 18 percent slate and did nothing. He never required a ton of the coal to be weighed on a neutral scale, never required Witzberger to stick to the mines he specified and never caused any tests of the coal to be made to determine the quality of coal delivered. The evidence discloses that he required tests to be made of other commodities sold to the city but not of coal.

The only course open to the trial judge was to submit the conduct of defendant to the jury. Defendant failed to comply with virtually all the regulations regarding the purchase of coal for the city which were set down for his guidance. He cannot now simply plead ignorance of that which everyone knew. Complaints about the poor quality of coal were constantly being sent in; the level of the production of B. T. U. per ton of coal was dropping. In 1949, Meyers says defendant lowered the B. T. U. requirement for the coal in the hope of attracting more bidders, but in that same year he required washed coal although there were only three suppliers in the county equipped to furnish washed coal, E. & W. Coal Co. being one. All

this conduct and the motive prompting it were for the jury.

Viewing the number and the character of defendant's variances from his official duty it is clear that they might produce the moral certainty of guilt which is said, in Com. v. Libonati, 346 Pa. 504, 508, and Com. v. Holt, 350 Pa. 375, 387, to be the true test of proof by circumstantial evidence, rather than absolute incompatibility with guilt. How can we, viewing this evidence, say that defendant was not willfully and corruptly using his powers to the detriment of the city which employed him? Misfeasance in office is often a species of fraud and the field of inquiry must necessarily be wide: Smith v. City of Philadelphia, 227 Pa. 423, 431. It is for the jury to determine, as to the classification of bidders under the first six counts and generally as to the last five counts, whether defendant acted willfully and fraudulently. Since defendant has been convicted we must view the evidence most strongly against him: Com. v. Knox, 172 Pa. Superior Ct. 510, 517.

Complaint is made as to the letting of contracts for coal for the years 1947, 1948, 1949 and 1950, the indictments referring only to 1949. The purpose of this evidence may be sufficiently stated. The Commonwealth complains that defendant sought to favor Witzberger and the E. W. Coal Co. as a bidder. This would of course support the contention that defendant acted corruptly. To show the fact the Commonwealth produced evidence that whenever Witzberger was not the low bidder readvertising and rebidding were required, as a consequence of which he got the contract, and, whenever he was the only bidder, he got the contract regardless of price.

The reasons for new trial are the stereotyped ones. Defendant, however, complains in his brief about the admission of the evidence of Joseph Priester, who had

been inspector for the city for a number of years before. This evidence was received to show the inspection procedures by which the city was protected at that time. Subordinates who participated in those operations were still in the city government under defendant. Thus he knew or could easily have found out that it was not impossible to protect the city and make sure it got the coal which it agreed to purchase and for which it paid.

After another careful survey of the evidence I am of the opinion that the question of defendant's guilt was for the jury. I would refuse the motion for a new trial and in arrest of judgment.